# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD LOUIS ARNOLD PHILLIPS, | Case No. 1:19-cv-01589-ADA-SAB-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS AND DENIAL OF PETITIONER'S REQUEST FOR EVIDENTIARY HEARING AND PETITION FOR FBI TO PRODUCE DOCUMENTS AND TAPES |
| v. | |
| RAYTHEL FISHER, | |
| Respondent. | |
| | (ECF Nos. 1, 64, 65) |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

#### A. The events of December 7, 1977

In September of 1977, Phillips met Ronald Rose and Bruce Bartulis, two partners in a general contracting business who were building a pair of houses on property adjacent to Phillips's beachfront home in Newport Beach, California. The three men became acquainted when Phillips offered the contractors use of his electrical outlets to power their construction tools. Phillips and the contractors became friendly, and Phillips began to visit the construction site regularly to speak with them.

---

[1] The Court relies on the Ninth Circuit's March 16, 2012 opinion for this summary of the facts of the crime and procedural history. Petitioner contests certain portions of the facts of the crime as set forth by the Ninth Circuit, which is discussed in more detail in note 2, infra.

On the first or second day of November 1977, Phillips asked Rose and Bartulis if they wanted to invest in a cocaine deal with him. Under the deal as Phillips described it, Rose and Bartulis would contribute $25,000 to purchase cocaine that would be smuggled into the United States from Peru, and would receive a five-fold return on their investment. Rose and Bartulis agreed to the illegal investment and provided Phillips with $10,000 on November 2, 1977, with the $15,000 balance to be provided at a later date. Over subsequent weeks, Phillips inquired regarding the remaining balance multiple times. Approximately three to four weeks after the first payment, Rose provided Phillips with an additional $1,500. Rose explained to Phillips that he and Bartulis had intended to finance the transaction using funds derived from their contracting business, and that the business had encountered financial difficulties. Rose at one point suggested that Phillips either use only the $11,500 already provided to finance Rose and Bartulis's share of the cocaine deal or return the money, and Phillips agreed to use the funds he had already received.

During the course of these discussions it emerged that Rose and Bartulis were having difficulty obtaining insulation for various construction projects. In late November or early December 1977, Phillips informed Rose that he was capable of acquiring stolen insulation and offered to arrange a sale of such material. Rose and Bartulis accepted Phillips's offer. According to Rose's testimony at Phillips's trial, Phillips told Rose "that his brother was a part of this deal," that the insulation was stored in a warehouse in Fresno, and that Rose and Bartulis would have to receive the insulation there.

Shortly thereafter, on December 7, Phillips informed Rose and Bartulis of the arrangements for the insulation transaction. Phillips told the two men to meet him that evening at a prearranged location in Fresno, a city in central California approximately four hours north of Newport Beach. From that location, they would drive to a second rendezvous point to meet Phillips's insulation source. That day, prior to leaving Newport Beach, Rose executed a notarized promissory note in the amount of $25,000 that he tendered to Phillips. Rose believed the note to be secured by property he owned, although he never signed the accompanying deed of trust. Of the $25,000 sum covered by the note, $13,500 constituted the balance on the cocaine deal and the remainder was intended as a down payment on a portion of the stolen insulation. Rose and Bartulis were unsure as to the total quantity of insulation they would ultimately purchase from Phillips's source, and Phillips therefore instructed them to bring as much additional cash to the meeting as possible.

After Rose gave Phillips the promissory note, they parted ways with plans to meet that evening in Fresno. Rose and Bartulis drove to Fresno in a two-door Ford Ranchero truck purchased by Rose for the construction firm and regularly used by Bartulis. In accordance with Phillips's suggestion that he bring extra cash, Rose carried with him to Fresno between $3,500 and $5,000 in $100 bills inside the left breast pocket of his jacket. Rose also brought a .44 magnum pistol.

Phillips flew to Sacramento, where his mother lived, intending to borrow his mother's car and drive to Fresno. Fresno is approximately two and half hours south of Sacramento by car. That same day, Sharon Colman, Phillips's girlfriend of two months, flew directly to Fresno. Colman had previously dated and lived with Phillips's best friend since childhood, Richard Graybill. Colman, a prostitute, had arranged to be picked up at the Fresno airport by a client. Her flight, however, was delayed, and her client was not there when she landed. She therefore called

Phillips at his mother's house in Sacramento and asked him to pick her up at the Fresno airport, which he did.[2]

From the Fresno airport, Phillips and Colman drove to meet Rose and Bartulis at a gas station. The four proceeded from there in two separate vehicles to Chowchilla, a town approximately thirty-five miles north of Fresno along Highway 99. Phillips and Colman led the way; Bartulis and Rose followed. Along the way, both cars stopped at a second gas station so that Phillips could use the restroom. Returning to his car from the restroom, Phillips stopped to talk to Rose, from whom he requested a pack of matches. Both cars then continued north on Highway 99.

Sometime after midnight, both cars pulled off the highway in Chowchilla and parked in a vacant lot. The lot was in a deserted area, with no buildings nearby. The vehicles parked alongside one another, with Phillips's car to the left so that the passenger door of his car was in line with and a few feet from the driver-side door of the Ranchero. Phillips sat in the driver's seat of his car with Colman in the passenger seat; in the adjacent Ranchero, Bartulis sat in the driver's seat, with Rose in the passenger seat.

According to Colman, Phillips got out of his car and went to talk to Rose and Bartulis for a period of time through the driver-side window of the Ranchero before reentering his car through the passenger side, asking Colman to slide over. Colman testified that at some point approximately thirty to forty-five minutes after their arrival at the lot—after Rose and Bartulis had each finished some beers and smoked a marijuana cigarette—Phillips again exited his car and went to talk to Rose and Bartulis, leaning into the Ranchero's open driver-side window. Rose, however, stated that Phillips came and spoke to him and Bartulis through the driver-side window only once, and that the conversation occurred within five minutes, not thirty to forty-five minutes, of their arrival at the vacant lot.

This discrepancy as to timing aside, both Colman and Rose agree that, at some point after arriving at their destination, Phillips was leaning into the Ranchero's driver-side window talking to Rose and Bartulis when he fired six shots at the two men using his .45 automatic pistol. Colman saw the shots being fired from the gun in Phillips's left hand. Rose did not see the shots being fired, but he heard the shots come from his left. Rose was hit five times, with one bullet grazing his skull, another piercing his arm, and the remaining three entering his abdomen. Bartulis was shot a single time through his heart and died almost instantly.

Immediately after the shooting ceased, Phillips hit Bartulis on the head with the end of his gun, reached through the Ranchero's window and, without opening the truck door, pulled Bartulis's wallet out of the truck. He then walked to Rose's side of the vehicle and removed Rose's wallet and a handgun. Phillips returned to his car and handed both wallets, as well as his and Rose's handguns, to Colman. In addition to Rose and Bartulis's identifications, the two wallets contained a total of

---

[2] Petitioner asserts that the prosecution withheld the tape recording of a police interview with Petitioner's brother-in-law, Dr. Donald ReVille, and the audio recording of a police interview with Petitioner's mother, Barbara Hollingshead, which demonstrated that he had planned on traveling to Sacramento to be with his mother while his sister (ReVille's wife) had a serious medical procedure and that such plans were made before Rose told Petitioner on December 7, 1977 that he wished to inspect the stolen building supplies. (Pet'r's Br. 12, ECF No. 2 at 24.) Petitioner's initial response when Colman outlined her transportation dilemma was to suggest Colman call someone else, and Petitioner did not ask to borrow his mother's car until after receiving Colman's telephone call. (Pet'r's Br. 52, ECF No. 2 at 64.)

between $120 and $150. Phillips did not remove from the Ranchero approximately $162 from Rose's pants pocket, nor did he take the $3,500 to $5,000 wad of one-hundred-dollar bills that was in the breast pocket of Rose's jacket. Phillips then directed Colman to open the trunk of his car, from which, according to Colman, he retrieved a gas can, and proceeded to pour gasoline over Rose and Bartulis's bodies inside the Ranchero. As Colman moved Phillips's car across the street, Phillips lit the two bodies on fire and made his way back to his car.

Upon being lit on fire, Rose (who had been shot five times) jumped out of the now burning Ranchero, and removed his flaming jacket. He was unable to remove the rest of his burning clothing and began to run around in pain. Phillips, upon seeing that Rose was still alive, drove toward him and hit him with his mother's car, cracking the windshield. Phillips and Colman then drove back to Phillips's mother's house in Sacramento.

Shortly after Phillips and Colman left the scene, Madera County Sheriffs discovered Rose (who was remarkably still alive), extinguished his burning clothing, and transported him to the hospital, where he underwent surgery followed by three months of burn treatment and rehabilitation. The deputies also found Rose's smoldering jacket, which still contained the packet of $100 bills that Rose had carried with him from Newport Beach.

The morning after the shootings, Phillips took his mother's car to a shop to have the cracked windshield repaired. Within a week, Rose was able to communicate to the Madera sheriffs the names of the people who accompanied him to the vacant lot. Arrest warrants for Phillips and Colman were issued on December 14th. Upon learning of the warrants, Colman and Phillips drove in a Corvette borrowed from Phillips's brother-in-law to Salt Lake City, where Phillips got a job and assumed a false identity. Colman stayed with Phillips in Utah for one or two weeks and then returned to Sacramento in the Corvette. Shortly thereafter she turned herself in to the Madera County Sheriff's Department.

Colman was taken into custody and was appointed counsel on December 27, 1977, three weeks after the shooting. The next day, December 28, Colman and her counsel met with the lead investigating officers from the Madera sheriff's department and with the district attorney, David Minier. During that meeting, Colman gave a detailed account of the shooting and the events leading up to it. Notably, during this hour-long interview, Colman did not indicate that Phillips had searched Rose for any length of time, nor did she say that he mentioned being unable to find the money that Rose had brought with him, or that he was disappointed by the absence of cash. To the contrary, she stated that on the ride back from Chowchilla Phillips disclosed to her his motive for the murder. That motive, according to Colman, was not robbery but a desire to eliminate Rose and Bartulis because he was concerned that they were setting him up, that they would double-cross him, and that they knew "too much about where the coke was coming from." In a subsequent interview with police on January 4, 1978, Colman changed her story on these points completely, now stating that Phillips complained after he returned to the car that he was disappointed not to have found Rose's money. She adhered to and indeed embellished upon the latter version of her story at trial, testifying that Phillips had spent "a lot longer" searching Rose than he had spent searching Bartulis, and that upon returning to the car Phillips stated "that he couldn't find the money that [Rose] had on him," and that during the drive to Sacramento Phillips repeatedly expressed frustration that he had been unable to find the cash brought by Rose. Although Colman was at the time of her

4

second police interview subject to the same capital charges as Phillips, two months after she gave her statement to the District Attorney she was released on bail without explanation, and her bail status was eventually adjusted to personal recognizance.

Once she was released from pre-trial custody, Colman moved back in with Richard Graybill, her former boyfriend. On March 13, 1978, just a few weeks after her release, Colman and Graybill were arrested for selling heroin to an undercover Fresno police officer. After the Madera County Sheriff's Department made multiple calls to the Fresno police department on Colman's behalf requesting that charges against her not be pursued because she was an important witness in a homicide investigation, the charges against her were dropped.

With the assistance of Graybill, the Madera sheriffs and the FBI located Phillips in Salt Lake City. Phillips was arrested and was eventually extradited to California to face prosecution. He was charged with the first degree murder of Bruce Bartulis, the attempted murder of Ronald Rose, and the robbery of both Bartulis and Rose. The prosecution also alleged as a special circumstance that the murder was committed in furtherance of a robbery. An affirmative jury finding with respect to the special circumstance was a necessary precondition to the holding of a capital sentencing proceeding and imposition of the death penalty. Phillips's trial began in January of 1980.

### B. The Trial

The prosecution's theory at trial was that Phillips conned Rose and Bartulis from the start in order to rob them. Minier, the Madera County District Attorney who prosecuted Phillips, argued that he never had any intention to import cocaine and there never was any stolen insulation, but rather Phillips had used the promised deals as ruses in order to steal tens of thousands of dollars from Rose and Bartulis before attempting to murder them and steal more. The prosecution argued that on December 7, the night of the shooting, Phillips lured the two men to the remote lot in Chowchilla with the intention of killing them, stealing the cash they brought with them to the meeting, and keeping the money that he had already received from them without ever having to produce a profit on the non-existent cocaine deal.

To support this theory, the prosecution highlighted a number of facts, drawn almost exclusively from the testimony of Rose and Colman, to show the careful planning that went into the killings. As evidence of that planning, the prosecutor argued that Phillips sought to manufacture an alibi by flying to his mother's house in Sacramento prior to driving to Fresno, rather than simply flying to Fresno directly as Colman did. As further evidence of premeditation, the prosecutor emphasized that, prior to meeting up with Rose and Bartulis, Phillips put a gasoline can in the trunk of his mother's car,[3] and that Phillips had asked Rose for matches when the two cars stopped en route to the vacant lot, actions that the prosecution argued showed Phillips intended in advance to burn his victims.[4]

The prosecutor likewise underscored evidence indicating that Phillips acted in a particularly methodical and cold-blooded manner. For example, he argued that Phillips sought to cover his tracks, not only by burning the bodies, but by picking

---

[3] Phillips's mother testified that she did not normally carry a gasoline can in the car.

[4] In a subsequent penalty phase retrial, Rose explained that he gave Phillips a marijuana cigarette along with the matches, but at Phillips's initial guilt trial he testified only that Phillips had requested matches.

up the bullet shell casings off the ground after the shooting, as there was only one shell recovered from the scene despite multiple shots being fired. He further argued that Phillips's cold-blooded manner was evidenced by Colman's testimony that Phillips struck Rose and Bartulis in the head after shooting them.

In addition to emphasizing facts suggesting premeditation and extensive advanced planning, the prosecutor highlighted evidence supporting the contention that Phillips's cocaine and insulation scheme was a ruse orchestrated to steal money from Rose and Bartulis. He emphasized that Phillips told Rose and Bartulis that the stolen insulation was going to be supplied by his brother even though Phillips does not have a brother.[5] The prosecutor also argued that the fact that Phillips told Rose to bring "as much money as he could get a hold of" to Fresno showed that Phillips planned to rob Rose and Bartulis once they got to the deserted lot. Similarly, the prosecutor stressed that Phillips searched the bodies after the shooting and took Rose and Bartulis's wallets. He also stressed that, according to Colman, Phillips said that he was upset that he could not find the money he expected Rose to be carrying.

Phillips's primary defense at trial was that he was not at the crime scene at all. This alibi rested almost exclusively on Phillips's own testimony. Phillips took the stand and testified that on the night of the shooting he was at an illicit business meeting at a disco. He claimed that he had helped set up the insulation deal, but that the deal itself was attended only by Rose, Bartulis, and Graybill (who was to supply the insulation). He further claimed that the real killers were Colman and Graybill, to whom he had loaned his mother's car on the night of the shooting. Phillips testified that Graybill returned to Phillips's mother's house at approximately 4:30 a.m. the morning of the shooting and that the windshield of the car was smashed. Finally, Phillips claimed that at some point he decided to take the fall for Graybill, thinking that he could plead guilty to second degree murder and thereby keep his longtime friend out of prison. Phillips did not offer a single witness to corroborate his alibi, and, when pressed for any details or specifics supporting it, such as the names of the people at his supposed meeting, he refused to respond, opting instead to plead the Fifth Amendment or asserting that if he gave any details regarding his criminal associates he "wouldn't be alive."

Phillips's attorney, Paul Martin, emphasized two arguments in addition to Phillips's improbable alibi. First, Martin repeatedly highlighted evidence suggesting that Bartulis's murder did not occur during the course of a robbery, stating in his closing argument, for example, that,

> This would be a dumb way to pull a plain, ordinary robbery, to meet two people in a rural area not knowing if they had any money or how much money, if any, ... this is no way to pull a robbery. This is a poor theory in my opinion, ... particularly when one of the individuals owes the man charged $25,000.

Later in his argument, Martin noted, regarding Phillips's failure to find the cash stashed in Rose's jacket pocket, that "[i]t's hard to miss a wad the size of a cigarette package in the upper breast pocket. If the pocket has something in it the

---

[5] Ever since Phillips abandoned his alibi testimony, he has maintained that the reference to "his brother" was intended to refer to his childhood friend Graybill. Rose could not remember at trial if Phillips had said "my brother" or "a brother."

size of a package of cigarettes, it's not easily missed if someone is a cool criminal."

Second, Martin insinuated that Colman was lying in exchange for offers of leniency from the prosecution. Martin introduced evidence that Colman—who, like Phillips, had been charged with capital murder in connection with the events of December 7, 1977—had been granted an unusual number of continuances for her preliminary hearing, and been released on her own recognizance notwithstanding the capital murder charges against her. In his closing statement, Martin emphasized that:

> She's threatened with the charge of murder. Why has it been continued for two years, more or less? ... [S]he's now on her own recognizance; doesn't even have to post a bail bond. She's out on the street.... What's the purpose in continuing it for two years? Her case could have been resolved with whatever deal they're going to make, and there's, obviously, a deal of some kind anticipated.... [T]hey're holding a murder charge over her head to compel her to testify, and she's singing like a bird, the tune that they call.

Colman, however, flatly denied having received any beneficial treatment in exchange for her testimony, and stated only, "I'm expecting that they would take into consideration that I am willing to cooperate." Colman further stated, "My attorney has advised me to testify and to put my confidence in my attorney," explaining, "She asked me if I had confidence in her, and if I had confidence in her that—to go under her advisement, and that her advisement was to testify." In his closing statement, the prosecutor, Minier, reaffirmed Colman's denial that she had been promised any benefits, emphasizing that she had testified "she has never been promised anything for her testimony in this case," and that any efforts by the defense to insinuate she had received a deal were "sheer fabrication, just pulled out of the air, totally meaningless."

The jury convicted Phillips on all counts, including the first-degree murder of Bartulis, and found the special circumstance of murder during the commission of a robbery to be true. At the subsequent penalty phase of the trial, Phillips was sentenced to death.

### C. Post–Conviction Proceedings

Phillips appealed his conviction and sentence directly to the California Supreme Court. *See People v. Phillips,* 41 Cal.3d 29, 222 Cal.Rptr. 127, 711 P.2d 423 (1985). Five years after the appeal was filed, the court affirmed Phillips's conviction but reversed his death sentence. The case was remanded for a new penalty phase trial. *Id.*, 222 Cal.Rptr. 127, 711 P.2d at 459. While he awaited a penalty phase retrial, Phillips filed a state habeas corpus petition making the claim, among others, that the trial prosecutor, Minier, had offered a plea deal to Colman's attorneys with the proviso that the deal not be communicated to Colman herself and that the deal was, in fact, communicated to Colman. Phillips argued that Minier violated his obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) by failing to disclose the benefits that Colman received in exchange for her testimony, and violated *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) by failing to correct Colman's false testimony regarding those benefits. The state court denied Phillips's *Brady/Napue* claim for failure to demonstrate materiality.

In October 1991, Phillips received a penalty phase retrial, and was again sentenced to death. On March 4, 1992, he filed this federal habeas petition in the district court, advancing his *Brady/Napue* claims and a claim of ineffective assistance of counsel, among others. The district court declined to entertain Phillips's petition because his appeal from his penalty retrial was at that time still pending in the California state courts. This panel reversed that decision on May 26, 1995, holding that Phillips could file a habeas petition as to the guilt phase separately from any petition as to the penalty phase. *Phillips v. Vasquez,* 56 F.3d 1030 (9th Cir.1995). On remand and after briefing, the district court denied Phillips's petition without an evidentiary hearing, holding that Phillips had not set forth any colorable claims for relief. We again reversed, holding that Phillips was entitled to an evidentiary hearing on both his ineffective assistance and *Brady/Napue* claims. *Phillips v. Woodford,* 267 F.3d 966 (9th Cir.2001).

On remand, the district court scheduled a three-day evidentiary hearing to begin on November 6, 2002. The date was later continued to December 4, 2002, and then to February 4, 2003. On October 15, 2002, Phillips moved to be rehoused in the Madera County jail to better assist his counsel in preparing for the hearing.[6] The district court denied his request, finding that "the convenience of counsel is not sufficient to justify the risk and expense involved with a federal court ordering a state entity to move a prisoner." The district court denied reconsideration on November 19, 2002.

On December 30, 2002, the district court issued an order stating: "After careful consideration, it is ORDERED that depositions in lieu of testimony be taken of David Minier, Paul Martin, Ron Rose, Sharon Colman, Tom Peterson, and Casandra Dunn." Neither party objected to the order.

Depositions were conducted between January 6th and January 13th, 2003. On January 16, 2003, Phillips filed a motion for a temporary protective order to prevent his deposition from being taken. On January 21, 2003, the district court denied his request, finding no basis for the protective order. The court then ruled, apparently acting sua sponte, that "all evidence in the upcoming evidentiary hearing will be presented by deposition ... and the evidentiary hearing set to begin February 4, 2003[is] vacated." The district judge asserted that this ruling was "[b]ased on prior agreement of the parties."[7]

On October 21, 2003, Phillips filed a motion requesting permission to file supplemental exhibits. Phillips then filed a motion on November 5, 2003, asking the district court to reconsider its order vacating the evidentiary hearing. The district court refused to reconsider its order, stating that, "[b]ased on prior representations by both parties, no witnesses remained to testify at a hearing, so written argument was determined to be more effective than oral argument and more effective than oral argument and briefs." In that same order, the court refused Phillips's request to file supplemental exhibits, holding that the documents were "untimely" and, in any event, were either duplicative or irrelevant. On February 20, 2004, the district court denied Phillips's guilt-phase claims, ruling on the merits that Phillips had not been prejudiced by any violations

---

[6] Phillips stated that because his counsel during the state habeas proceedings had suffered from a nervous breakdown, no one other than himself had the knowledge of the case necessary to assist his appointed counsel in preparing the files for the scheduled hearing.

[7] Evidence of such an agreement does not exist in the record, although the status conferences held on May 13 and August 27 of 2002 were not transcribed.

that occurred with respect to either his ineffective assistance of counsel claim or his *Brady/Napue* claims.

Phillips, 673 F.3d at 1171–78 (footnote 2 added).

The Ninth Circuit affirmed the district court's "holding that Phillips's trial counsel was not ineffective, as well as its holding that the prosecution's *Brady* and *Napue* violations were not material to Phillips's first-degree murder conviction, his attempted murder conviction, or his robbery convictions," but reversed "the district court's holding that the prosecution's *Napue* violations were not material to the jury's special circumstances finding." Phillips v. Ornoski, 673 F.3d 1168, 1197 (9th Cir. 2012), as amended on denial of reh'g and reh'g en banc (May 25, 2012). The Ninth Circuit "remand[ed] to the district court with instructions to grant a conditional writ of habeas corpus" and held that the "state may either grant Phillips a new trial on the special circumstance allegation within ninety days or sentence him to a penalty other than death in conformance with state law." Id.

The State retried Petitioner's special circumstance, electing to seek a sentence of life without the possibility of parole, and the jury found the murder was committed in furtherance of the robbery. (Answer 4, ECF No. 35 at 13.)[8] Petitioner was resentenced to life without the possibility of parole on November 7, 2019. (LD[9] 93.) Petitioner filed a notice of appeal and sought direct review in the California state courts. (LD 94.)

Meanwhile, on November 7, 2019, Petitioner filed the instant federal habeas petition. (ECF No. 1.) In the petition, Petitioner raises the following claims for relief: (1) the prosecution withheld favorable material evidence from the defense, in violation of Brady; (2) the prosecution committed misconduct by presenting false testimony to the jury and failing to correct knowingly false testimony from a key prosecution witness; (3) the prosecution violated due process by structuring an accomplice's plea agreement to require the accomplice to testify in accordance with previous statements to law enforcement rather than requiring truthful testimony; (4) cumulative error; and (5) outrageous government conduct. (ECF No. 1 at 6–13.)

---

[8] Page numbers usually refer to pagination assigned by the CM/ECF system. The Court may also provide internal document pagination for clarification.

[9] "LD" refers to the documents lodged by Respondent. (ECF Nos. 36–39.)

1    Respondent moved to dismiss the petition, arguing that this Court should abstain from

2  any review or involvement until the state court direct review proceedings are final. (ECF No.

3  20.) Subsequently, Petitioner voluntarily dismissed his state court appeal. (LD 94.) Thus, the

4  Court denied the motion to dismiss and directed Respondent to file an answer. (ECF Nos. 27,

5  28.) Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 35, 61.)

6                                                **II.**

7                                    **STANDARD OF REVIEW**

8    Relief by way of a petition for writ of habeas corpus extends to a person in custody

9  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

10  or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

11  529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

12  by the U.S. Constitution. The challenged convictions arise out of the Madera County Superior

13  Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

14    On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

15  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

16  enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

17  Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is

18  therefore governed by its provisions.

19    Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred

20  unless a petitioner can show that the state court's adjudication of his claim:

21        (1) resulted in a decision that was contrary to, or involved an
         unreasonable application of, clearly established Federal law, as
22        determined by the Supreme Court of the United States; or

23        (2) resulted in a decision that was based on an unreasonable
         determination of the facts in light of the evidence presented in the
24        State court proceeding.

25  28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538

26  U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

27    As a threshold matter, this Court must "first decide what constitutes 'clearly established

28  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71

(quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

///

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Where the state courts reach a decision on the merits but there is no reasoned decision, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

1  issue, but rather, the only method by which we can determine whether a silent state court

2  decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. While the federal court cannot

3  analyze just what the state court did when it issued a summary denial, the federal court must

4  review the state court record to determine whether there was any "reasonable basis for the state

5  court to deny relief." <u>Richter</u>, 562 U.S. at 98. This Court "must determine what arguments or

6  theories . . . could have supported, the state court's decision; and then it must ask whether it is

7  possible fairminded jurists could disagree that those arguments or theories are inconsistent with

8  the holding in a prior decision of [the Supreme] Court." <u>Id.</u> at 102.

9  "AEDPA also restricts the scope of the evidence that we can rely on in the normal course

10  of discharging our responsibilities under § 2254(d)(1)." <u>Murray v. Schriro</u>, 745 F.3d 984, 998

11  (9th Cir. 2014). "AEDPA's 'backward-looking language requires an examination of the state-

12  court decision at the time it was made. It [then logically] follows that the record under review is

13  limited to the record in existence at that same time, *i.e.*, the record before the state court.'" <u>Id.</u>

14  (alteration in original) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011)). "Federal courts

15  sitting in habeas may consider the entire state-court record, not merely those materials that were

16  presented to state appellate courts." <u>McDaniels v. Kirkland</u>, 813 F.3d 770, 780 (9th Cir. 2015).

17  **III.**

18  **REVIEW OF CLAIMS**

19  **A. <u>Brady</u>**

20  In Ground One, Petitioner asserts that the prosecution withheld favorable material

21  evidence from the defense, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963). (ECF No. 1 at

22  6.) Petitioner specifically contends that the prosecution withheld: (1) the tape recording of a

23  police interview with Petitioner's brother-in-law, Dr. Donald ReVille, and the audio recording of

24  a police interview with Petitioner's mother, Barbara Hollingshead; (2) recordings and/or reports

25  of Petitioner's telephone calls that were traced and recorded by the FBI; (3) the telephone bills of

26  Dr. ReVille and Michael Ruane, Petitioner's Newport Beach neighbor; and (4) a report written

27  by Madera County Sheriff Coroner Edward Bates and a December 1977 report authored by

28  Madera County Sergeant Dale Fore. (ECF No. 1 at 27–35.)

1         1. *Brady* Legal Standard

2         "In <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), [the

3 Supreme] Court held that the government violates the Constitution's Due Process Clause 'if it

4 withholds evidence that is favorable to the defense and *material* to the defendant's guilt or

5 punishment.'" <u>Turner v. United States</u>, 137 S. Ct. 1885, 1888 (2017) (quoting <u>Smith v. Cain</u>, 565

6 U.S. 73, 75 (2012)). "There are three components to a true <u>Brady</u> violation: '[t]he evidence at

7 issue must be favorable to the accused, either because it is exculpatory, or because it is

8 impeaching; that evidence must have been suppressed by the State, either willfully or

9 inadvertently; and prejudice must have ensued.'" <u>Benson v. Chappell</u>, 958 F.3d 801, 837 (9th

10 Cir. 2020) (alteration in original) (quoting <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82 (1999)).

11 "The terms 'material' and 'prejudicial' are used interchangeably in <u>Brady</u> cases." <u>Benn v.</u>

12 <u>Lambert</u>, 283 F.3d 1040, 1053 n.9 (9th Cir. 2002). "The prosecution's failure to disclose

13 evidence is prejudicial 'if there is a reasonable probability that, had the evidence been disclosed

14 to the defense, the result of the proceeding would have been different.'" <u>Ochoa v. Davis</u>, 16

15 F.4th 1314, 1327 (9th Cir. 2021) (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)

16 (opinion of Blackmun, J.)). "A 'reasonable probability' of a different result exists when the

17 failure to disclose 'undermines confidence in the outcome of the trial.'" Ochoa, 16 F.4th at 1327

18 (quoting <u>Bagley</u>, 473 U.S. at 678 (majority opinion)).

19         2. <u>ReVille and Hollingshead Interviews</u>

20         Petitioner's <u>Brady</u> claim regarding the ReVille and Hollingshead interviews was

21 presented to the California Supreme Court in case number S230849. (LD 87.) The petition was

22 summarily denied on January 13, 2016. (LD 88.) The Court presumes that the California

23 Supreme Court adjudicated this claim on the merits, <u>see</u> <u>Johnson</u>, 568 U.S. at 301, but there is no

24 reasoned state court decision. Accordingly, AEDPA's deferential standard of review applies, and

25 the Court "must determine what arguments or theories . . . could have supported the state court's

26 decision; and then it must ask whether it is possible fairminded jurists could disagree that those

27 arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

28 Court." <u>Richter</u>, 562 U.S. at 102.

1    Here, Petitioner asserts that the prosecutor withheld the tape recording of a police
2    interview with Petitioner's brother-in-law, Dr. Donald ReVille, and the audio recording of a
3    police interview with Petitioner's mother, Barbara Hollingshead.[10] (ECF No. 1 at 27.) Petitioner
4    contends that these interviews demonstrate that he had planned on traveling to Sacramento to be
5    with his mother while his sister (ReVille's wife) had a serious medical procedure, and thus, the
6    prosecution's theory that Petitioner traveled to Sacramento solely to set up an alibi for his
7    offenses was false.  (ECF No. 1 at 27.) Petitioner also appears to argue that the ReVille interview
8    recording contained statements regarding a shootout and had the defense known the contents of
9    the recording, a shootout defense would have been presented at trial rather than Petitioner's alibi
10   defense.

11   Respondent asserts that it would have been reasonable for the state court to reject relief
12   because Petitioner failed to show that the ReVille interview or the Hollingshead recording were
13   material to the defense or contained information that was unknown by the defense. Respondent
14   contends that criminal defendants may harbor multiple intents and the fact that Petitioner may
15   have desired to assist his mother and be present while his sister had a medical procedure does not
16   rule out that he was simultaneously setting up an alibi. Respondent also argues that the defense
17   was aware of the shootout statements by ReVille and argues that it cannot be a violation of
18   Brady to fail to divulge to the defense statements by witnesses that are demonstrably false.
19   (Answer 23–24, ECF No. 35 at 32–33.)

20   To the extent that the ReVille and Hollingshead interviews demonstrate that Petitioner
21   had planned on traveling to Sacramento to be with his mother while his sister had a medical
22   procedure, the Court finds that it would not have been objectively unreasonable for the state
23   court to deny relief. "Under Brady's suppression prong, if 'the defendant is aware of the essential
24   facts enabling him to take advantage of any exculpatory evidence,' the government's failure to
25   bring the evidence to the direct attention of the defense does not constitute 'suppression.'"
26   Cunningham v. Wong, 704 F.3d 1143, 1154 (9th Cir. 2013) (quoting  Raley v. Ylst, 470 F.3d

27
---
28   [10] Petitioner acknowledges that prior to his guilt-phase trial, the prosecution provided the defense with a partial transcription of the Hollingshead interview but claimed that the tape had been recorded over. (ECF No. 1 at 27.)

792, 804 (9th Cir. 2006)). Here, Petitioner was presumably aware of the essential facts regarding his travel plans to Sacramento to assist his mother during his sister's serious medical procedure.

Additionally, for reasons discussed in section III(A)(6), infra, it would not have been objectively unreasonable for the state court to determine that the evidence was not material because Petitioner had not shown that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

### 3. FBI Reports and Recordings of Petitioner's Telephone Calls

Petitioner's Brady claim regarding FBI reports and recordings of Petitioner's telephone calls was raised in a state habeas petition filed on August 6, 2014 in the Madera County Superior Court, which denied the petition on October 1, 2014 because Petitioner "failed to support his request for relief including reasonably available documentation and failed to establish that that [sic] the claims asserted in the present petition are timely or that they could not have been presented earlier." (LD 82, ECF No. 38-25 at 3.) Petitioner then raised this claim in a state habeas petition filed on October 31, 2014 in the California Court of Appeal, Fifth Appellate District, which denied the petition on November 20, 2014 because "[i]t is untimely, successive, conclusional, speculative, and unsupported by all reasonably available documentary evidence. It also lacks declarations from persons with firsthand knowledge of the events petitioner relies on to advance its claims. It also is denied on its merits." (LD 83.) Subsequently, Petitioner raised this claim in a state habeas petition filed on December 31, 2014 in California Supreme Court case number S223521. (LD 85.) The petition was summarily denied on February 11, 2015. (LD 86.)

"[F]ederal habeas law employs a 'look through' presumption." Wilson, 138 S. Ct. at 1193. That is, "[w]here there has been one reasoned state judgment rejecting a federal claim, [the Court presumes] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst, 501 U.S. at 803. The Supreme Court has employed the "look through" presumption in cases involving the merits and procedural default. See Wilson, 138 S. Ct. 1188; Ylst, 501 U.S. 797. The presumption may be rebutted "by showing that the

1 unexplained affirmance relied or most likely did rely on different grounds than the lower state

2 court's decision, such as alternative grounds for affirmance that were briefed or argued to the

3 state supreme court or obvious in the record it reviewed." Wilson, 138 S. Ct. at 1192.

4          Here, Respondent contends that "the state is no longer advancing arguments that

5 subsequent state silent denials adopt the reasoning provided by lower courts" in light of

6 Robinson v. Lewis, 9 Cal. 5th 883 (2020). (Answer 62–63, ECF No. 35 at 71–72.) In Robinson,

7 the California Supreme Court explained that "[a]ll courts in California have original habeas

8 corpus jurisdiction." 9 Cal. 5th at 895. If petitioners are unsuccessful in the superior court and

9 file a petition in the California Court of Appeal, that petition "is a *new* petition invoking that

10 court's original jurisdiction." Id. at 895–96. "Thus, a Court of Appeal that considers a new

11 petition does not directly review the superior court's ruling but makes its own ruling." Id. at 896.

12 However, "[i]f a lower court has made factual findings following an evidentiary hearing, the

13 higher court will give those findings great weight, but it is not bound by them." Id. If the

14 California Court of Appeal denies habeas relief, a petitioner has two options: (1) file a petition

15 for review in the California Supreme Court that "is subject to tight time limits"; or (2) file "a

16 new, original petition for a writ of habeas corpus in [the California Supreme Court] invoking

17 [that] court's original jurisdiction." Id. In the second scenario, the California Supreme Court does

18 "not directly review the lower courts' rulings although, again, [it] will give any lower court's

19 factual findings great weight if an evidentiary hearing was held." Robinson, 9 Cal. 5th at 896.

20          Respondent argues that given the California Supreme Court's explanation in Robinson,

21 "there is no basis to 'look through' the state supreme court's summary merits denial to assign the

22 state superior court's [procedural default] reasoning to it." (Answer 63, ECF No. 35 at 72.)

23 However, the Court notes that the last reasoned decision is the California Court of Appeal's

24 November 20, 2014 denial of Petitioner's state habeas petition. See Ylst, 501 U.S. at 802

25 (defining an unexplained order as one "whose text or accompanying opinion does not disclose

26 the reason for the judgment").

27          The Court finds that Robinson does not eliminate the "look through" presumption

28 employed in federal habeas cases. In Flemming v. Matteson, 26 F.4th 1136 (9th Cir. 2022), the

Ninth Circuit stated that "history and context demonstrates that the Supreme Court . . . has specifically *rejected* the argument that the general 'look through' presumption is rebutted by internal state procedures for a state supreme court indicating that its summary, unreasoned orders do *not* adopt the lower court's rationale." Id. at 1143 (emphasis in original). The Ninth Circuit "therefore elect[ed] to follow the rationale laid forth in *Wilson* and apply the 'look through' presumption" and specifically noted that Robinson v. Lewis, 9 Cal. 5th 883 (2020), "is consistent with this conclusion." Id. Accordingly, the Court presumes that the California Supreme Court's February 11, 2015 denial rests upon the same grounds as the California Court of Appeal's November 20, 2014 denial. "[W]hen a state court 'double-barrels' its decision—holding that a claim was procedurally barred and denying the claim on its merits—both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA." Apelt v. Ryan, 878 F.3d 800, 825 (9th Cir. 2017). However, procedural default is an affirmative defense that the state must assert; otherwise the defense is waived, Vang v. Nevada, 329 F.3d 1069, 1073 (9th Cir. 2003), and this Court must address the claim on the merits, Smith v. Ryan, 823 F.3d 1270, 1285 (9th Cir. 2016). As Respondent is not asserting the procedural default defense here, the Court will address Petitioner's Brady claim regarding FBI reports and recordings of Petitioner's telephone calls on the merits applying AEDPA deference. Thus, this Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

Petitioner argues:

> Release of all FBI reports and wiretap tapes would have opened the door to impeaching Colman with her statements made during law enforcement interviews that she did not know Phillips' current location. Defense counsel would also have been alerted that FBI agents not on the prosecution's witness list had participated in the investigation of the case. Calling these agents as defense witnesses would have exposed Colman as the source of the information used to obtain a subpoena for the phone records. This would have led to the defense discovering the additional benefits provided Colman in the form of dropping the Heroin sale charge in Fresno County in exchange for the information leading to the phone trace- a benefit never before any jury.

(ECF No. 2 at 29.) Based on Petitioner's argument above, this <u>Brady</u> claim is similar to Petitioner's previous <u>Napue</u> and <u>Brady</u> claim regarding Colman's immunity agreement and the dropped heroin charges. For reasons discussed in section III(A)(6), infra, it would not have been objectively unreasonable for the state court to determine that the evidence was not material because Petitioner had not shown that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682.

4. <u>ReVille and Ruane Telephone Bills</u>

Petitioner's <u>Brady</u> claim regarding the ReVille and Ruane telephone bills was presented to the California Supreme Court in case number S241426. (LD 89.) The petition was summarily denied on May 10, 2017. (LD 90.) The Court presumes that the California Supreme Court adjudicated this claim on the merits, <u>see</u> <u>Johnson</u>, 568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential standard of review applies, and the Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

To the extent that any ReVille and Ruane telephone bills would support Petitioner's claim that he had planned on traveling to Sacramento to be with his mother while his sister had a medical procedure, the Court finds that it would not have been objectively unreasonable for the state court to deny relief. "Under <u>Brady</u>'s suppression prong, if 'the defendant is aware of the essential facts enabling him to take advantage of any exculpatory evidence,' the government's failure to bring the evidence to the direct attention of the defense does not constitute 'suppression.'" <u>Cunningham</u>, 704 F.3d at 1154 (quoting   <u>Raley</u>, 470 F.3d at 804). Here, Petitioner was presumably aware of the essential facts regarding his travel plans to Sacramento to assist his mother during his sister's serious medical procedure and any phone calls discussing such plans.

///

Additionally, for reasons discussed in section III(A)(6), infra, it would not have been objectively unreasonable for the state court to determine that the evidence was not material because Petitioner had not shown that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>Bagley</u>, 473 U.S. at 682.

### 5. Police Reports

Petitioner appears to assert that the prosecution withheld a report authored by former Sheriff Bates with respect to the vehicle the victims were shot in and a December 1977 report in which Sergeant Fore wrote that ReVille stated he had asked Colman how the windshield in the Hollingshead Toyota had been damaged and that Colman had told ReVille "once they met the other guys, both parties shot at each other at the same time, shooting out the window shield in the Toyota." (ECF No. 1 at 34 (quoting Pet'r's Excerpts 062, ECF No. 3 at 68)).

It is unclear from the record before this Court whether Petitioner's <u>Brady</u> claims with respect to the Bates and Fore reports have been exhausted.[11] However, pursuant to 28 U.S.C. § 2254(b)(2), the Court may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does not raise even a colorable federal claim." <u>Cassett v. Stewart</u>, 406 F.3d 614, 624 (9th Cir. 2005) (adopting the standard set forth in <u>Granberry v. Greer</u>, 481 U.S. 129, 135 (1987)).

### a. Alleged Report Authored by Former Sheriff Bates

This Court previously rejected Petitioner's <u>Brady</u> claim regarding any reports authored by former Sheriff Bates, stating:

---

[11] A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995); <u>Picard v. Connor</u>, 404 U.S. 270, 276 (1971). To provide the highest state court the necessary opportunity, the petitioner must "fairly present" the claim with "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." <u>Duncan</u>, 513 U.S. at 365; <u>Gray v. Netherland</u>, 518 U.S. 152, 162-63 (1996). "Fair presentation requires that the petitioner 'describe in the state proceedings both the operative facts and the federal legal theory on which his claim is based so that the state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon his constitutional claim.'" <u>Davis v. Silva</u>, 511 F.3d 1005, 1009 (9th Cir. 2008) (citation omitted).

There is no evidence that a report by Sheriff Bates exists.[12] A report by Sheriff Bates has never been produced. The only evidence supporting the existence of such a report is Sheriff Bates' declaration that it was his custom and practice to prepare reports of investigations such as the one he performed on the Ranchero.

. . .

Further, as stated *supra* Claim 3, Phillips' allegations that these reports contain exculpatory evidence are mere suppositions, with no supportive evidence. Examination of the pleadings and the record reveals the bullet trajectory evidence supports the prosecution's theory that the bullets were fired from a position by the driver's window, where both Rose and Colman placed Phillips. There is no indication in any report by law enforcement, or in any testimony, that exculpatory evidence regarding bullet trajectories existed. Phillips' failure to produce exculpatory evidence defeats the basis for a violation of due process under *Brady*.[13]

(LD 64, ECF No. 38-7 at 65, 66 (footnotes in original)).

The Ninth Circuit affirmed, stating:

Phillips contends that the prosecution failed to disclose reports prepared by former Madera County Sheriff/Coroner Edward Bates and by the California Department of Justice concerning their examinations of the burnt-out Ranchero truck. Phillips asserts that the reports contain exculpatory evidence that would support his claim that it was Rose who shot Bartulis, and that the suppression of the reports violates the dictates of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In support of his allegation, Phillips introduced declarations to the effect that Bates had a practice of filling out reports describing the results of such examinations, and that the truck was delivered to the California Department of Justice by a towing service at the behest of the District Attorney's office.

The State maintains that the Ranchero was never examined by the Department of Justice (and thus no DOJ report exists), and that even if Sheriff Bates did prepare a report, it would not have contained any evidence favorable to Phillips. Although there is some evidence that would support Phillips's allegation that Bates did in fact prepare a report, the State is correct that absolutely no evidence supports Phillips's claim that such a report would have contained exculpatory evidence,

---

[12] In February 1992, then Sheriff (former Sgt.) Seymour's personal examination of the Phillips file at the Madera County Sheriff's Office revealed no report by former Sheriff Bates regarding the Ranchero. *See* Bates's declaration, FHP, Exh. 13.

Further, Phillips was granted funds in this proceeding for the express purpose of gathering crime scene evidence and reports. The petition contains no reference to the results of this investigation as to either the Bates or the DOJ reports. Nor was any notice given that the approved investigation could not be completed. The only reasonable conclusion is that neither of the subject reports exist.

[13] Since there is no showing that either report, even if they exist, contains exculpatory evidence, it is not necessary to address whether the evidence was material under *United States v. Bagley*, 473 U.S. 667 (1985).

and that claim is directly contradicted by Bates' own declaration.[14] As to Phillips's claim that the State suppressed a report by the California DOJ, the evidence that any report was in fact developed is tenuous, at best.[15] The district court did not err in characterizing Phillips's *Brady* claims as "mere suppositions," and Phillips is not entitled to a hearing to pursue them further.

Phillips v. Woodford, 267 F.3d 966, 987 (9th Cir. 2001) (footnotes in original).

Petitioner contends that he raises "additional points regarding Bates' declaration not previously addressed by this court and not ruled upon" by the Ninth Circuit. Specifically, Petitioner directs the Court's attention to both of Bates's declarations in which "Bates opines Phillips did not fire the fatal shot," arguing that "[t]his is relevant to what evidence was withheld from the defense pre-guilt trial." (Traverse 18, ECF No. 61 at 21.) Although Petitioner may be focusing on different portions of the Bates declaration than in his previous proceeding, Petitioner has not presented additional evidence in support of this claim that was not previously presented.

This Court previously found that "[t]here is no evidence that a report by Sheriff Bates exists." (LD 64, ECF No. 38-7 at 65.) The Ninth Circuit previously found that "absolutely no evidence supports Phillips's claim that such a report would have contained exculpatory evidence, and that claim is directly contradicted by Bates' own declaration." Phillips, 267 F.3d at 987. Therefore, it is "perfectly clear" that Petitioner does not raise a colorable Brady claim with respect to any alleged reports authored by former Sheriff Bates, and the Court may deny Petitioner's unexhausted claim for relief on the merits under 28 U.S.C. § 2254(b)(2).

### b. Report Authored by Sergeant Fore

The Madera County Superior Court previously found, after conducting an evidentiary hearing, "that the defense did have the police report about the so called 'shootout' told to a Doctor Reville by Sharon Colman." (LD 41, ECF 37-16 at 270.) Additionally, this Court also previously found that defense counsel "Martin received, prior to the trial, a copy of the police report where Dr. Reville disclosed Colman's statement regarding a shoot-out," citing to the

---

[14] Bates attested that any report that he would have developed would not have included any exculpatory material because, in his opinion, none existed.

[15] The record includes a declaration from a DOJ examiner who asserts that he was the only DOJ official to work on the case, that he never examined the Ranchero, and that the DOJ would not have accepted a car delivered by a towing service.

notation on the bottom right of the report, the 1990 state court evidentiary hearing, and Martin's declaration. (LD 64, ECF No. 38-7 at 55.) The Court notes that the copy of Sergeant Fore's report submitted to this Court has a notation on the bottom right that reads: "Given to Martin by S.O. – his copy not numbered." (Pet'r's Excerpts 062, ECF No. 3 at 68.) The Ninth Circuit also noted:

> During a state-court evidentiary hearing in January, 1990, [defense counsel] Martin testified that he "would have considered putting on an alternative defense of self-defense and mutual shoot-out if [he] had Colman's December 28, 1977, statement and the police report indicating Colman had told Dr. ReVille that there had been a mutual shoot-out." In fact, Martin *did* have that evidence, and the state habeas court made a finding of fact to that effect.

Phillips, 267 F.3d at 977.

Petitioner challenges the prior state habeas court's conclusion that Martin had received the pre-trial "report wherein Dr. ReVille stated Colman had told Dr. ReVille the confrontation ended when 'both parties shot at each other at the same time'" given that there was "no Bates stamp on the report, no receipt signed by Martin or his investigator, or any testimony from a deputy or detective stating he has personally issued the report to Martin," (Pet'r's Br. 17 n.7, ECF No. 2 at 29 (citation omitted)). These arguments are severely undercut by the notation on the report itself and the fact that the state habeas court came to its conclusion after holding an evidentiary hearing. As it is "perfectly clear" that Petitioner does not raise a colorable Brady claim with respect to the December 1977 report written by Sergeant Fore containing statements about a shootout, the Court may deny Petitioner's unexhausted claim for relief on the merits under 28 U.S.C. § 2254(b)(2).

6. Materiality

In determining materiality, the "suppressed evidence" must be "considered collectively, not item by item." Kyles v. Whitley, 514 U.S. 419, 436 (1995). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 434. "[O]nce a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review." Id. at 435.

The Court finds that it would not have been objectively unreasonable for the state courts to determine that the withheld evidence was not material because Petitioner had not shown that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.

Petitioner contends that the ReVille and Hollingsworth interviews and the ReVille and Ruane telephone bills are material because they would support his claim that Petitioner made plans to travel to Sacramento to assist his mother during his sister's serious medical procedure, said plans were made before the building supplies deal with Rose and Bartulis was set, and thus, Petitioner did not travel to Sacramento to manufacture an alibi. However, as noted by Respondent, criminal defendants may harbor multiple intents and the fact that Petitioner may have made prior plans to travel to Sacramento to assist his mother during his sister's serious medical procedure is not necessarily incompatible with taking advantage of the situation to set up an alibi.

Petitioner argues that the report authored by Sergeant Fore, the ReVille interview, and the FBI reports and recordings are material because if the defense was aware of the shootout statement made by Colman to ReVille and the reference to a shootout made by Graybill, a shootout defense would have been made at trial. However, at the time of the guilt-phase trial, it was the prosecution's understanding that Colman lied to ReVille about a shootout at Petitioner's request and thus, the prosecutor would have elicited such testimony on cross-examination. In her federal deposition, Colman testified that she was told by Petitioner to tell ReVille that there had been a shootout, which was a lie. (Colman Dep. 85–86, 148–49, ECF No. 38-20.) The prosecutor confirmed this in his federal deposition, testifying that he was aware "Colman was merely lying and telling Dr. RoVille [sic] what Speed Phillips had told her to say" regarding a shootout where both parties shot at each other. (Minier Dep. 43, ECF No. 38-17 ; see id. 124–25.)

With respect to the FBI reports and recordings of Petitioner's telephone calls, Petitioner argues:

> Release of all FBI reports and wiretap tapes would have opened the door to impeaching Colman with her statements made during law enforcement interviews that she did not know Phillips' current location. Defense counsel would also have

1
2
3
4

been alerted that FBI agents not on the prosecution's witness list had participated in the investigation of the case. Calling these agents as defense witnesses would have exposed Colman as the source of the information used to obtain a subpoena for the phone records. This would have led to the defense discovering the additional benefits provided Colman in the form of dropping the Heroin sale charge in Fresno County in exchange for the information leading to the phone trace- a benefit never before any jury.

5   (Pet'r's Br. 17, ECF No. 2 at 29.) Additionally, Petitioner asserts that the ReVille and Ruane

6   telephone bills would establish that Colman falsely testified at Petitioner's guilt-phase trial when

7   she testified that she contacted him at the Holiday Inn North. (Pet'r's Br. 39, ECF No. 2 at 51.)

8   However, the Ninth Circuit, on de novo review, previously held under Napue that "Colman's

9   testimony was not material to the conviction on the first-degree murder count[.]" Phillips, 673

10  F.3d at 1192. At issue here is "Brady's higher standard of materiality," id. at 1190, and the more

11  deferential AEDPA standard of review.

12          Having considered the withheld evidence collectively, the Court finds that the state

13  courts' denials of Petitioner's Brady claims were not contrary to, or an unreasonable application

14  of, clearly established federal law, nor were they based on an unreasonable determination of fact.

15  The decisions were not "so lacking in justification that there was an error well understood and

16  comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562

17  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

18          **B. Ground Two**

19          In Ground Two, Petitioner asserts that the prosecution presented false testimony and

20  failed to correct knowingly false testimony from a key prosecution witness. (ECF No. 1 at 8.)

21  Petitioner contends that the prosecutor knowingly elicited false testimony from Colman, who

22  testified that until the shooting started, she did not know the whereabouts of Petitioner's .45

23  automatic. Colman later admitted in a deposition that she transported Petitioner's .45 automatic

24  to Fresno. The prosecutor "capitalized on Colman's false testimony and interjected his personal

25  opinion on the subject of how Phillips came to possess his .45 automatic the night of the

26  confrontation, during closing arguments." (Id. at 36.) Petitioner contends that if the prosecution

27  fulfilled its objection to correct Colman's testimony regarding Petitioner's weapon, "it is

28  reasonably probable no jury would have found Phillips guilty of first degree murder." (Id.)

Respondent argues that it was reasonable to reject a claim that the prosecutor failed to correct knowingly false testimony because Petitioner failed to show that the prosecution knew Colman's guilt trial testimony was false, the additional testimony that Colman brought the gun to the scene of the murder and robbery at Petitioner's direction could not have made a difference, and the testimony was not actually false when viewed in context. (Answer, 43–44, ECF No. 35 at 52–53.)

At the outset, the Court notes that there appears to be two distinct issues that Petitioner challenges in Ground Two. First, Petitioner asserts that the prosecutor knowingly elicited false testimony from Colman at the guilt-phase trial regarding the whereabouts of Petitioner's .45 automatic. The Court will consider this issue in terms of a <u>Napue</u> violation. Additionally, Petitioner challenges the prosecutor "capitaliz[ing]" on Colman's testimony and "interject[ing] his personal opinion on the subject of how Phillips came to possess his .45 automatic the night of the confrontation, during closing arguments." (ECF No. 1 at 36.) The Court will consider this issue in terms of prosecutorial misconduct.

Ground Two was raised in a state habeas petition filed in the California Supreme Court, which summarily denied the petitions. (LDs 91, 92.) The Court presumes that the California Supreme Court adjudicated this claim on the merits, <u>see</u> <u>Johnson</u>, 568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential standard of review applies, and the Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

    1.  <u>Relevant Background</u>

        **a.  Guilt-Phase Trial**

At the guilt-phase trial, Colman testified that during the time that she lived at the home on the beach with Petitioner in the two months leading up to December 7, 1977, she had a .25

///

///

automatic firearm and Petitioner "had a large automatic handgun." (7 RT[16] 135–35, ECF No. 36-9.) With respect to the moment immediately before the shooting began on December 7, 1977, the prosecutor asked, "Now at this point in time, as the Defendant was outside the vehicle, again talking,[17] did you have any knowledge as to where the large automatic pistol was?" (7 RT 148.) Colman answered, "No." (Id.) Colman then testified that the second time Petitioner got out of the car, he was talking and standing next to the driver's side of the Ranchero with his hands in his pockets. Petitioner then leaned into the window of the Ranchero with his elbows into the window and Colman heard shots being fired. (7 RT 148.) Colman testified that she heard more than one shot, the shots sounded like they were coming from one place, she saw Petitioner holding his arm into the window of the car, she saw a gun in Petitioner's hand after his arm was no longer in the window of the car, and the gun appeared similar to the gun Petitioner had at his Balboa home. (7 RT 148–49.) Colman testified that after the shooting, Petitioner handed her two wallets and two guns and that while driving to Sacramento, Petitioner stated that the caliber of the gun was too big because he was too close. (7 RT 150, 158, 203.) Although on cross-examination defense counsel asked Colman about the location of her pistol when she left for Fresno,[18] it does not appear that either the prosecution or the defense asked Colman how Petitioner came to be in possession of the large automatic pistol. The prosecutor only asked Colman if she knew where it had been immediately before the shooting.

### b. Federal Deposition

In her federal deposition, Colman testified that during the two-month period leading up to December 7, 1977, she possessed a .25 automatic firearm and Petitioner had a .45 automatic. (Colman Dep. 14–15, ECF No. 38-20.) Colman testified that she flew to Fresno at Petitioner's

---

[16] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 36.)

[17] Leading up to this specific question, Colman had testified that on December 7, 1977, she flew to Fresno and called Petitioner in Sacramento. They arranged for Petitioner to pick Colman up from the airport. Petitioner picked Colman up from the airport in a Toyota with a white top and they drove to a closed gas station to meet Bartulis and Rose. (7 RT 137–39.) They (Colman and Petitioner in the Toyota followed by Bartulis and Rose in a Ranchero) drove to another gas station and subsequently drove north on Highway 99 and took an off-ramp and stopped at a parking lot just to the right of the off-ramp. Colman testified that Petitioner exited the Toyota, went to the Ranchero, and started talking to Bartulis and Rose. Petitioner then got into the passenger side of the Toyota, continued to talk with Bartulis and Rose, and later exited the Toyota again to talk to Bartulis and Rose. (7 RT 140–48.)

[18] Colman testified that her pistol was in her suitcase when she left for Fresno and that she did not have any special reason for carrying it to Fresno. (7 RT 172.)

1   direction and that he told her he would pick her up and that they would meet with Bartulis and

2   Rose regarding building materials. (Colman Dep. 32, 35, 164, 174–75.)

3       Colman testified that Petitioner flew out of a different airport. (p. 38.) Petitioner knew

4   that one of the airports had a metal detector and Petitioner wanted Colman to use the airport

5   without a metal detector. (Colman Dep. 38–39.) Colman flew out of the airport without a metal

6   detector and brought Petitioner's gun in her baggage at Petitioner's request. (Id. at 39, 174.)

7   Petitioner did not want to travel with guns because he had just gotten out of jail. (Id. at 175.)

8   Colman testified she "knew that [Petitioner] did not want to meet Rose and Bartulis without it

9   [the .45 caliber automatic]." (Id. at 173.)

10      Colman testified that she called Petitioner and he eventually picked her up from the

11  Fresno airport before the meeting with Bartulis and Rose. (Colman Dep. 41–42, 45.) At the time

12  of the shooting, Colman saw Petitioner with a gun in his left hand. (Id. at 66.) After the shooting,

13  Petitioner handed Colman two guns and two wallets. One of the guns was Petitioner's gun and

14  the second gun was in Petitioner's possession after Petitioner came back from the passenger side

15  of the Ranchero. (Id. at 71–72.)  Colman testified that she did not recall getting Petitioner's gun

16  out of her luggage for him. (Id. at 48.) Colman thought that Petitioner unpacked his .45

17  automatic handgun from her suitcase, but she did not see Petitioner retrieve it. (Id. at 165–66.) At

18  some later point, Colman looked into her suitcase and there was no .45 automatic therein. (Id. at

19  166.)

20                          **c.  Procedural History**

21      After the federal depositions, Petitioner "argue[d] that new evidence showing Colman

22  transported Phillips' gun to Fresno militates in his favor" with respect to his ineffective

23  assistance of counsel claim for failure to investigate and present a shootout defense. (LD 79,

24  ECF No. 38-22 at 22.) In rejecting Petitioner's argument, this Court stated:

25          Phillips argues that new evidence showing Colman transported Phillips' gun to
            Fresno militates in his favor. Colman admitted in her deposition that she believes
26          she transported Phillips' gun from Balboa to Fresno. January 13, 2003 at 39.
            Colman had previously maintained she did not even know Phillips was in
27          possession of his gun. Phillips charges this change is significant, because Colman
            finally admitted that she, not Phillips, had control of his gun. Phillips contends
28          that he did not even intend to travel to Fresno the night of December 7, 1977, and

                                          28

if not for the fortuity of the person whom Colman had arranged to meet not showing up, he would not have even known where Colman, and his gun, were in Fresno.

Phillips points out that in two interviews with law enforcement after her arrest, at the preliminary hearing and at the guilt trial, Colman denied knowing that Phillips had his gun, and at the penalty re-trial Colman denied transporting Phillips' gun in her suitcase. At her deposition, Colman admitted to transporting Phillips' gun in her suitcase, asserting she did so at his request. This discrepancy, Phillips asserts, when considered with her prior statements and testimony, is not inconsequential. Phillips contends Colman's plans to stay at the Carousel Inn were tentative, and that had the arrangements gone as planned, Phillips would not have known where she was nor have had access to his gun. None of this was investigated or presented to the jury by Martin.

During direct examination at the guilt trial, Colman denied having any knowledge of where the large automatic pistol was. Martin asked no questions on this subject on cross-examination, despite his knowledge that Phillips possessed a .45 caliber automatic handgun in Balboa and that Phillips had traveled on a commercial airline from Orange County International to Sacramento the same day as the meeting with Rose and Bartulis. Phillips contends this knowledge should have prompted Martin to question how the murder weapon got to the crime scene. Phillips asserts Martin could have no tactical reason for failing to ask Colman about this, but failed to do so because he failed to investigate this point, failed to ask questions about metal detectors, and so failed to elicit the admission from Colman that she transported the gun.

Phillips observes that the State seeks to shield Martin by pointing to the fact he argued a shoot-out had occurred during closing argument. However, Phillips argues Martin had no factual support for the shoot-out argument since he failed to investigate the information provided by the prosecution. Further, Phillips claims Colman's December 28, 1977 interview described a scenario where robbery does not appear to be the motive for the shooting. Phillips declares Colman's admission that she carried Phillips' gun to Fresno fortifies Phillips argument that no robbery-murder was intended.

Colman's admission about carrying Phillips' gun to Fresno does not fortify the argument that no robbery-murder was intended when considered in light of the totality of the evidence, especially the fact that Colman told Phillips she was planning to stay at the Carousel Motel in Fresno, December 28, 1977 interview at 17, that Rose stated Phillips set the meeting with Bartulis and him at the Carousel Motel, January 7, 2003 deposition at 53-54, and that Colman asserts she brought Phillips' gun to Fresno specifically so he would have it for his meeting with Rose and Bartulis. January 13, 2003 deposition at 173-74. It was not unreasonable for Martin to have made a tactical decision not to cross-examine Colman about Phillips' gun, or to otherwise question how Phillips' gun got to the crime scene, since it would have been inconsistent with the alibi defense to establish that Phillips' gun was the murder weapon.

(LD 79, ECF No. 38-22 at 22–24.)

This Court denied Petitioner's ineffective assistance of counsel claim. (LD 79, ECF No. 38-22 at 29.) The Ninth Circuit affirmed, holding "we are compelled to overrule our 2001

1    holding that Martin's performance at Phillips's trial was constitutionally ineffective, and to now

2    hold that his shortcomings were not such as to overcome the 'strong presumption that counsel

3    made all significant decisions in the exercise of reasonable professional judgment.'" <u>Phillips</u>, 673

4    F.3d at 1181 (quoting <u>Pinholster</u>, 131 S. Ct. at 1407).

5         2.   <u>Napue</u>

6              **a.   Legal Standard**

7         "The knowing use of false evidence by the state, or the failure to correct false evidence,

8    may violate due process." <u>Towery v. Schriro</u>, 641 F.3d 300, 308 (9th Cir. 2010) (citing <u>Napue v.</u>

9    <u>Illinois</u>, 360 U.S. 264, 269 (1959)). "To establish a <u>Napue</u> claim, a petitioner must show that '(1)

10   the testimony (or evidence) was actually false, (2) the prosecution knew or should have known

11   that the testimony was actually false, and (3) . . . the false testimony was material.'" <u>Towery</u>, 641

12   F.3d at 308 (quoting <u>United States v. Zuno–Arce</u>, 339 F.3d 886, 889 (9th Cir. 2003)). In

13   assessing materiality, the Court must determine whether "there is 'any reasonable likelihood that

14   the false testimony could have affected the judgment of the jury.'" <u>Soto v. Ryan</u>, 760 F.3d 947,

15   958 (9th Cir. 2014) (quoting <u>Hayes v. Brown</u>, 399 F.3d 972, 978 (9th Cir. 2005)). A court need

16   not review all three <u>Napue</u> prongs if a petitioner's argument fails at any one of the prongs. <u>See</u>

17   <u>Panah v. Chappell</u>, 935 F.3d 657, 664 (9th Cir. 2019); <u>Towery</u>, 641 F.3d at 308.

18              **b.   Analysis**

19        Petitioner contends that the prosecutor "knowingly elicited false testimony from Colman,

20   who told the jury that until the shooting started she did not know the whereabouts of Phillips' .45

21   automatic." (ECF No. 1 at 36.) As support for this claim of falsity, Petitioner cites to Colman's

22   federal deposition where she testified that she had transported Phillips' .45 automatic to Fresno.

23   (<u>Id.</u>)

24        Here, it would not have been objectively unreasonable for the state court to deny relief

25   based on a determination that Colman's testimony was not actually false. Although Colman later

26   testified in her federal deposition that she transported Petitioner's .45 automatic to Fresno, such

27   testimony is not necessarily inconsistent with her guilt-phase trial testimony that she did not have

28   any knowledge as to where the large automatic pistol was at the time Petitioner was outside of

the Toyota talking with Rose and Bartulis in the parking lot. Although Colman had knowledge she transported Petitioner's firearm to Fresno in her luggage, such knowledge does not equate with knowing the firearm's subsequent location at the time Petitioner was outside of the Toyota talking with Rose and Bartulis in the parking lot and immediately before the shooting commenced.

Further, it would not have been objectively unreasonable for the state court to deny relief based on a determination that Petitioner had not "show[n] that the state *knowingly* created a false impression." Towery, 641 F.3d at 309. Petitioner does not point to anything in the record that would indicate the prosecution knew at the time of the guilt-phase trial that Colman had transported the .45 automatic to Fresno. Petitioner contends that Madera County Detective Seymour was aware of the security procedures (and lack of metal detectors) for the Annex terminal Colman had passed through at Orange County airport. However, awareness of the lack of metal detectors at the Annex terminal does not mean that the prosecution was aware that Colman in fact had transported Petitioner's firearm on her flight to Fresno. In fact, based on the following exchange during Colman's January 4, 1978 interview, it appears the prosecution believed that Colman did not know the location of Petitioner's firearm:

> [Seymour]:    . . . *[W]here abouts in that car did Speed [Petitioner] keep his gun?*
>
> [Colman]:    *I don't know. I didn't know he had it.* (Excerpts pp. 120:21-22; 121:1.)
>
> [Flores]:    *You knew that, you knew that, that, that, that a, Speed had a gun, right? And he had a .45. Did you know he was off when he come off the uh, when he come to pick you up?*
>
> [Colman]:    *No.*
>
> [Seymour]:    *You didn't know he had a gun?*
>
> [Colman]:    *No.* (Excerpts p. 123:10-15.)

(Pet'r's Br. 47, ECF No. 2 at 59.)

Finally, it would not have been objectively unreasonable for the state court to deny relief based on a determination that the testimony at issue was not material and there was no reasonable likelihood that it could have affected the judgment of the jury. See Hayes, 399 F.3d at

978. As noted by the Ninth Circuit,

> Rose provided extensive testimony identifying Phillips as the culprit, and the prosecution played at trial an audio tape of a phone conversation recorded after Bartulis's murder but before Phillips's arrest in which he described to his friend Richard Graybill that "a .45 sure did put a big hole right through him. I mean, it didn't fuck around." In addition, Phillips's flight to another state and his effort to conceal his identity provided further significant evidence of his guilt.

Phillips, 673 F.3d at 1190. Thus, "a reasonable juror, in order to conclude that Phillips was not proven guilty of murdering Bartulis, would not only have had to disregard Phillips's recorded statement to Graybill, his flight, and other post-murder conduct, but would also have had to conclude that Rose was wrong when he identified the individual who shot him multiple times, set him on fire and ran him over with his car, despite the fact that he knew the individual well and had traveled with him from Fresno to the site of the shooting." Phillips, 673 F.3d at 1191.

Additionally, with respect to premeditation,

> [t]he prosecution pointed out: that Phillips sought to manufacture an alibi by flying to his mother's house in Sacramento prior to driving to Fresno, rather than simply flying to Fresno directly;[19] that Phillips lured Rose and Bartulis to an isolated remote lot, far from his hometown where he might have been a suspect for the shootings; that Phillips asked Rose for matches when the two cars stopped en route to the vacant lot, suggesting that Phillips intended in advance to set the victims and their car on fire in order to conceal their identities;[20] and that Phillips told Rose and Bartulis that the stolen insulation was going to be supplied by his brother even though Phillips does not have a brother, and no insulation was ever produced. The state also presented evidence that Phillips methodically attempted to hide his role in the murder, not only by concealing his victims' identities by pouring gas on them and lighting them on fire after shooting them, but also by removing the bullet shell casings from the scene after the shooting.

Phillips, 673 F.3d at 1191 (first footnote added). The Ninth Circuit previously found that "the evidence of premeditation the prosecution presented was sufficiently powerful and abundant that there is not a 'reasonable likelihood' that the prosecution's failure to correct Colman's testimony, and its deliberate falsehood in telling the jury that there was no agreement, could have affected the jury's judgment that Phillips premeditated the murder." Id. Petitioner contends that a "jury hearing a prosecutor forced to correct his star witness for giving knowingly false testimony [regarding the whereabouts of Petitioner's gun] would have struck a blow to the heart of the

---

[19] See note 2, supra.

[20] In contrast to his testimony at the penalty-phase retrial, Rose did not explain at the initial trial that he gave Phillips a marijuana cigarette along with the matches.

prosecution's theory of premeditation." (Pet'r's Br. 56, ECF No. 2 at 68.) However, the list of evidence of premeditation set forth by the Ninth Circuit did not include the prosecutor's contention that Petitioner transported his gun to Fresno himself. Even discounting the evidence regarding the matches and flying to Sacramento to create an alibi, this Court finds, like the Ninth Circuit, that the listed evidence of premeditation was sufficient such that it would not have been objectively unreasonable for the state court to conclude Colman's testimony regarding her lack of knowledge regarding the whereabouts of Petitioner's firearm immediately before the shooting could not have affected the jury's premeditation determination.

Based on the foregoing, the Court finds that the state court's denial of Petitioner's Napue claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 3. Prosecutorial Misconduct

#### a. Legal Standard

In Darden v. Wainwright, 477 U.S. 168 (1986), the Supreme Court held that a prosecutor's improper comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 477 U.S. at 181 (internal quotation marks omitted) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). See Parker v. Matthews, 567 U.S. 37, 45 (2012) (finding Darden to be the clearly established federal law relevant to a prosecutor's improper comments). "'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned,' because the effect on the trial as a whole needs to be evaluated in context." Floyd v. Filson, 949 F.3d 1128, 1150 (9th Cir. 2020) (quoting Darden, 477 U.S. at 181). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). "Prosecutorial misconduct which rises to the level of a due process violation may provide the grounds for granting a habeas petition only if that misconduct

1  is deemed prejudicial under the 'harmless error' test articulated in *Brecht*," which "requires that

2  we independently evaluate whether an error 'had substantial and injurious effect or influence in

3  determining the jury's verdict.'" Shaw v. Terhune, 380 F.3d 473, 478 (9th Cir. 2004) (quoting

4  Brecht, 507 U.S. at 637).

5         **b.  Analysis**

6         Petitioner asserts that the prosecutor committed misconduct during his opening and

7  closing statements at the guilt-phase trial by "capitaliz[ing] on Colman's false testimony" and

8  "interject[ing] his personal opinion on the subject of how Phillips came to possess his .45

9  automatic the night of the confrontation." (ECF No. 1 at 36.) For the reasons set forth in section

10  III(B)(2), supra, the Court finds that it would not have been objectively unreasonable for the state

11  court to conclude that any misconduct with respect to the prosecutor's opening and closing

12  statements did not have a substantial and injurious effect or influence in determining the jury's

13  first-degree murder verdict. As previously noted, the list of evidence of premeditation the Ninth

14  Circuit found to be "sufficiently powerful and abundant," Phillips, 673 F.3d at 1191, did not

15  include the prosecutor's theory that Petitioner had transported his gun to Fresno himself.

16         Based on the foregoing, the Court finds that the state court's denial of Petitioner's

17  prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly

18  established federal law, nor was it based on an unreasonable determination of fact. The decision

19  was not "so lacking in justification that there was an error well understood and comprehended in

20  existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103.

21  Accordingly, Petitioner is not entitled to habeas relief on this ground.

22         **C.  Structure of Colman's Plea**

23         In Ground Three, Petitioner asserts that the prosecutor commits misconduct and due

24  process is violated when the prosecutor structures an accomplice's plea agreement requiring

25  testimony in accordance with previous statements to law enforcement and omits any requirement

26  of truthful testimony. (ECF No. 1 at 9.) Petitioner also contends that AEDPA should not be

27  applied to this claim because it should be viewed as relating back to his pre-AEDPA case.

28  (Pet'r's Br. 57, ECF No. 2 at 69.) Respondent argues that it was reasonable to reject a claim that

the prosecutor's plea arrangement with Colman's attorney violated due process because there is no controlling United States Supreme Court precedent and there was simply no violation and no ensuing prejudice. Respondent contends that AEDPA should apply because Petitioner's prior case is closed and his current custody stems from his life without the possibility of parole sentence imposed in November 2019. (Answer 51–52, ECF No. 35 at 60–61.)

Petitioner does not provide any authority that supports his contention that AEDPA should not be applied to this claim because it should be viewed as relating back to his pre-AEDPA case. In fact, as noted by Respondent, the Ninth Circuit previously rejected an identical argument in Libberton v. Ryan, 583 F.3d 1147, 1161–62 (9th Cir. 2009). This claim was raised in state habeas petitions filed in the California Supreme Court, which summarily denied the petitions. (LDs 89–92.) The Court presumes that the California Supreme Court adjudicated this claim on the merits, see Johnson, 568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential standard of review applies, and the Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Richter, 562 U.S. at 102.

Petitioner contends that due process is violated when the prosecutor structures an accomplice's plea agreement requiring testimony in accordance with previous statements to law enforcement and omits any requirement of truthful testimony. (ECF No. 1 at 9.) Petitioner acknowledges that "[t]he U.S. Supreme Court has never addressed this particular scenario; however, [it] has written volumes on violation of due process as a result of prosecutorial misconduct." (Pet'r's Br. 56, ECF No. 2 at 68.) Further, the Ninth Circuit has held "that there is no Supreme Court case law establishing that consistency clauses violate due process or any other constitutional provision. Because it is an open question in the Supreme Court's jurisprudence, we cannot say that the state court unreasonably applied clearly established Federal law by rejecting [petitioner]'s claim based on the consistency agreement." Cook v. Schriro, 538 F.3d 1000, 1017 (9th Cir. 2008) (quotation marks omitted) (quoting Carey v. Musladin, 549 U.S. 70, 127 S.Ct.

649, 654 (2006)). <u>Accord</u> <u>Boyer v. Chappell</u>, 793 F.3d 1092, 1106 (9th Cir. 2015) (noting petitioner had not identified any clearly established Supreme Court precedent suggesting an agreement stating that witness's testimony would be consistent with certain prior statements made to police violates due process or any other constitutional provision).

Based on the foregoing, the Court finds that the state court's denial of Petitioner's due process and prosecutorial misconduct claim regarding Colman's plea agreement structure was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

**D.  Ground Five**

In Ground Five, Petitioner asserts that outrageous government conduct resulted in the withholding or destruction of clearly discoverable material evidence and that holding the special circumstance retrial without the withheld evidence was a violation of the Due Process Clause. (ECF No. 1 at 13.) Respondent argues this claim must fail because Petitioner fails to prove the existence of the materials and fails to show that any of the purported materials were exculpatory or material. Further, Respondent contends that Petitioner has not exhausted his claim that retrial without certain evidence violated due process. (ECF No. 35 at 68.)

1.  <u>Outrageous Government Conduct</u>

Petitioner asserts that outrageous government conduct resulted in the withholding or destruction of clearly discoverable material evidence. (ECF No. 1 at 13.) This claim was raised in a state habeas petition filed in the California Supreme Court, which summarily denied the petition. (LDs 91, 92.) The Court presumes that the California Supreme Court adjudicated this claim on the merits, <u>see</u> <u>Johnson</u>, 568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential standard of review applies, and the Court "must determine what arguments or theories . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are

1    inconsistent with the holding in a prior decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at
2    102.

3         "A prosecution results from outrageous government conduct when the actions of law
4    enforcement officers or informants are 'so outrageous that due process principles would
5    absolutely bar the government from invoking judicial processes to obtain a conviction.'" <u>United</u>
6    <u>States v. Pedrin</u>, 797 F.3d 792, 795 (9th Cir. 2015) (quoting <u>United States v. Russell</u>, 411 U.S.
7    423, 431–32 (1973)). "The standard for dismissal on this ground is 'extremely high,'" and
8    "[d]ismissals are 'limited to extreme cases in which the government's conduct violates
9    fundamental fairness'" and "is 'so grossly shocking and so outrageous as to violate the universal
10   sense of justice.'" <u>Pedrin</u>, 797 F.3d at 795 (quoting <u>United States v. Smith</u>, 924 F.2d 889, 897
11   (9th Cir. 1991); <u>United States v. Gurolla</u>, 333 F.3d 944, 950 (9th Cir. 2003); and <u>United States v.</u>
12   <u>Stinson</u>, 647 F.3d 1196, 1209 (9th Cir. 2011)).

13        Here, Petitioner asserts that outrageous government conduct resulted in the withholding
14   or destruction of the following evidence: the Madera Sheriff's Office's ("MSO") Evidence
15   Inventory Logs for Petitioner's case; the MSO's Evidence "Chain-of-Custody" Logs; FBI
16   wiretap tapes; original tapes of MSO's December 28, 1977 and January 4, 1978 interviews with
17   Colman and March 14, 1978 interview with Rose; four case related cassette tapes received by
18   MSO from the Madera County Narcotics Enforcement Team on "4-23-93"; at least forty-eight
19   percent of the known law enforcement reports in this case; thirty-four percent of the evidence
20   exhibits collected by law enforcement in this case; and approximately 140 pages of reports
21   generated by the FBI related to Petitioner's case. (Pet'r's Br. 65, ECF No. 2 at 77.) Petitioner
22   states:

> The cornerstone of support for Phillips' Claim of outrageous governmental
> conduct is best summarized in two statements: "I have looked through all of the
> Madera County Sheriff's Department files, as well as the District Attorney's
> Office's files, and have found no reports of notes that speak of a traced phone call
> that led to your arrest" (Excerpts p. 061, letter from Judge LiCalsi); and a
> conversation between two law enforcement officers: "He [MSO Identification
> Officer Angus] did say he recalled a small file that "disappeared[.]"'" (Excerpts p.
> 173, memo by Sheriff Bates.)

28   (Pet'r's Br. 73, ECF No. 2 at 85.)

The Court finds that it would not have been objectively unreasonable for the state court to conclude that Petitioner had not satisfied the "extremely high standard" to establish outrageous government conduct. Smith, 924 F.2d at 897. Although "[t]here is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, [and] so every case must be resolved on its own particular facts," the Ninth Circuit has found that "it is outrageous for government agents to engineer and direct a criminal enterprise from start to finish, or for the government to use excessive physical or mental coercion to convince an individual to commit a crime," or "for the government to generate new crimes merely for the sake of pressing criminal charges." United States v. Black, 733 F.3d 294, 302 (9th Cir. 2013) (quotation marks, brackets, and citations omitted). Here, it would not have been objectively unreasonable for the state court to determine that the disappearance of evidence pertaining to Petitioner's case, which has spanned over forty years, is not "so grossly shocking and so outrageous as to violate the universal sense of justice." Pedrin, 797 F.3d at 795 (internal quotation marks and citation omitted). See United States v. McClelland, 72 F.3d 717, 721 (9th Cir. 1995) ("[A]llegedly poor police work hardly constitutes outrageous government conduct."); United States v. Wiley, 794 F.2d 514, 515 (9th Cir. 1986) ("Because the conduct must shock the conscience, however, outrageous government conduct is not to be equated with negligence or poor judgment.").

Based on the foregoing, the Court finds that the state court's denial of Petitioner's outrageous government conduct claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

### 2. Special Circumstance Retrial Without Certain Evidence

#### a. Exhaustion

A petitioner in state custody who is proceeding with a petition for writ of habeas corpus must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based

on comity to the state court and gives the state court the initial opportunity to correct the state's alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v. Lundy, 455 U.S. 509, 518 (1982). A petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider each claim before presenting it to the federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971). To provide the highest state court the necessary opportunity, the petitioner must "fairly present" the claim with "reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." Duncan, 513 U.S. at 365; Gray v. Netherland, 518 U.S. 152, 162–63 (1996).

Respondent contends that Petitioner has not exhausted Ground Five with respect to the special circumstance retrial because in his petition to the California Supreme Court, "Petitioner did not argue that his special circumstance retrial would itself amount to outrageous governmental conduct. Petitioner argued merely that, 'retrial without the material evidence withheld and/or destroyed, would be a further violation of due process.'" (Answer 60, ECF No. 35 at 69 (quoting LD 91 at 1).) However, in Ground Five, Petitioner states that "[r]etrial without the withheld evidence will be a violation of the Due Process Clause." (ECF No. 1 at 13.) Petitioner contends that he "should be able to turn to the record and case files to prepare for retrial," but "[f]or reasons directly attributable to outrageous governmental conduct in withholding and mishandling material evidence, [he] cannot" and thus, "retrial will be a violation of the Due Process Clause of the Fourteenth Amendment[.]" (Pet'r's Br. 72–73, ECF No. 2 at 84–85.) Respondent has misconstrued Petitioner's claim. The petition and brief in support of the petition make clear that Petitioner's claim of outrageous governmental conduct is limited to the alleged withholding, mishandling, and/or destruction of evidence, and that proceeding with the special circumstance retrial without the withheld and/or destroyed evidence would violate due process. As acknowledged by Respondent, Petitioner did argue in his petition to the California Supreme Court that "retrial without the material evidence withheld and/or destroyed, would be a further violation of due process." (LD 91 at 1, ECF No. 39-11 at 13.)

1    Based on the foregoing, the Court finds that this claim was fairly presented to the

2  California Supreme Court, which summarily denied the petition. (LDs 91, 92.) The Court

3  presumes that the California Supreme Court adjudicated this claim on the merits, see Johnson,

4  568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential

5  standard of review applies, and the Court "must determine what arguments or theories . . . could

6  have supported, the state court's decision; and then it must ask whether it is possible fairminded

7  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

8  decision of [the Supreme] Court." Richter, 562 U.S. at 102.

9       **b.  Analysis**

10   In California v. Trombetta, 467 U.S. 479 (1984), the Supreme Court stated:

11         Under the Due Process Clause of the Fourteenth Amendment, criminal
           prosecutions must comport with prevailing notions of fundamental fairness. We
12         have long interpreted this standard of fairness to require that criminal defendants
           be afforded a meaningful opportunity to present a complete defense. To safeguard
13         that right, the Court has developed "what might loosely be called the area of
           constitutionally guaranteed access to evidence." United States v. Valenzuela–
14         Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982). Taken
           together, this group of constitutional privileges delivers exculpatory evidence into
15         the hands of the accused, thereby protecting the innocent from erroneous
           conviction and ensuring the integrity of our criminal justice system.
16

17  Trombetta, 467 U.S. at 485. With respect to "the government's duty to take affirmative steps to

18  preserve evidence on behalf of criminal defendants," id. at 486, the Supreme Court declared:

19         Whatever duty the Constitution imposes on the States to preserve evidence, that
           duty must be limited to evidence that might be expected to play a significant role
20         in the suspect's defense. To meet this standard of constitutional materiality,
           evidence must both possess an exculpatory value that was apparent before the
21         evidence was destroyed, and be of such a nature that the defendant would be
           unable to obtain comparable evidence by other reasonably available means.
22

23  Id. at 488–89 (footnote and internal citation omitted).

24    To the extent Petitioner contends that proceeding with the special circumstance retrial

25  without the withheld and/or destroyed evidence was a violation of due process, the Court finds

26  that the state court's denial of this claim was not objectively unreasonable because Petitioner has

27  not established the constitutional materiality of the evidence at issue. Petitioner contends that

28  "[t]his Court should find there is presumptive prejudice because without the evidence logs

1   Phillips cannot identify what has been destroyed and what is being withheld." (Pet'r's Br. 77,
2   ECF No. 2 at 89.) However, the cases to which Petitioner cites to support this argument all
3   concern a defendant's right to a speedy trial and "the presumption that pretrial delay has
4   prejudiced the accused," Doggett v. United States, 505 U.S. 647, 652 (1992), which is not at
5   issue here.

6         The Supreme Court has acknowledged that "[w]henever potentially exculpatory evidence
7   is permanently lost, courts face the treacherous task of divining the import of materials whose
8   contents are unknown and, very often, disputed," Trombetta, 467 U.S. at 486, but has been
9   "unwilling[] to read the 'fundamental fairness' requirement of the Due Process Clause as
10  imposing on the police an undifferentiated and absolute duty to retain and to preserve all material
11  that might be of conceivable evidentiary significance in a particular prosecution," Arizona v.
12  Youngblood, 488 U.S. 51, 58 (1988). The Supreme Court concluded "that requiring a defendant
13  to show bad faith on the part of the police both limits the extent of the police's obligation to
14  preserve evidence to reasonable bounds and confines it to that class of cases where the interests
15  of justice most clearly require it," and held "that unless a criminal defendant can show bad faith
16  on the part of the police, failure to preserve potentially useful evidence does not constitute a
17  denial of due process of law." Youngblood, 488 U.S. at 58.

18        Here, it would not have been objectively unreasonable for the state court to conclude the
19  disappearance of evidence pertaining to Petitioner's case, which has spanned over forty years,
20  and proceeding with the special circumstance retrial without said evidence does not rise to the
21  level of a due process violation. Petitioner has not established that the evidence "possess[ed] an
22  exculpatory value that was apparent before the evidence was destroyed," Trombetta, 467 U.S. at
23  489, or "show[n] bad faith on the part of the police," Youngblood, 488 U.S. at 58. The Court
24  recognizes the difficult position in which Petitioner finds himself with respect to identifying and
25  discerning the exculpatory value of any withheld and/or destroyed evidence. However, as noted
26  above, the Supreme Court has been "unwilling[] to read the 'fundamental fairness' requirement
27  of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to
28  retain and to preserve all material that might be of conceivable evidentiary significance in a

1  particular prosecution." <u>Youngblood</u>, 488 U.S. at 58. Based on the foregoing, the Court finds that

2  the state court's denial of Petitioner's due process claim was not contrary to, or an unreasonable

3  application of, clearly established federal law, nor was it based on an unreasonable determination

4  of fact. The decision was not "so lacking in justification that there was an error well understood

5  and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>,

6  562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on this ground.

7  **E.  Cumulative Error**

8  In his fourth claim for relief, Petitioner asserts that the cumulative errors at his trial

9  resulted in a trial so fundamentally unfair that it violated the Constitution and this Court cannot

10  have confidence in the outcome. (ECF No. 1 at 11.) Specifically, in addition to Colman's plea

11  agreement structure, Petitioner points to the following alleged errors:

> (1) the prosecutor withheld favorable FBI reports that were not discovered until
> Phillips filed for FOIA discovery; (2) the prosecutor withheld tape recordings
> made by the FBI, at the behest of Madera County law enforcement, not
> discovered until FOIA discovery; (3) the prosecutor withheld taped law
> enforcement interviews with material witnesses that were made in 1977 and not
> disclosed to the defense until 2015; (4) the prosecutor used knowingly false
> testimony throughout this case, that was not discovered until federal deposition,
> then corroborated in the taped interviews first inadvertently provided to the
> defense in 2015; and (5) the prosecution withheld material evidence (telephone
> bills) not discovered until March 2017.

18  (Pet'r's Br. 61, ECF No. 2 at 73.) Respondent argues that it was reasonable to reject the

19  cumulative error claim. (Answer 53, ECF No. 35 at 62.)

20  Cumulative error claims were raised in Petitioner's state habeas petitions filed in the

21  California Supreme Court, which summarily denied the petitions. (LDs 85–90.) The Court

22  presumes that the California Supreme Court adjudicated this claim on the merits, <u>see</u> <u>Johnson</u>,

23  568 U.S. at 301, but there is no reasoned state court decision. Accordingly, AEDPA's deferential

24  standard of review applies, and the Court "must determine what arguments or theories . . . could

25  have supported, the state court's decision; and then it must ask whether it is possible fairminded

26  jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

27  decision of [the Supreme] Court." <u>Richter</u>, 562 U.S. at 102.

28  ///

1    "The Supreme Court has clearly established that the combined effect of multiple trial

2    court errors violates due process where it renders the resulting criminal trial fundamentally

3    unfair. . . . even where no single error rises to the level of a constitutional violation or would

4    independently warrant reversal." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing

5    Chambers v. Mississippi, 410 U.S. 284, 298, 302–03, 290 n.3 (1973)). The Ninth Circuit has

6    "granted habeas relief under the cumulative effects doctrine when there is a 'unique symmetry'

7    of otherwise harmless errors, such that they amplify each other in relation to a key contested

8    issue in the case." Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) (citing Parle, 505

9    F.3d at 933).

10    Although Petitioner contends that "[t]hese issues, cumulatively, would have cast the guilt

11    trial in such a different light," (ECF No. 2 at 75), he has not demonstrated the existence of "a

12    'unique symmetry' of otherwise harmless errors, such that they amplify each other in relation to

13    a key contested issue in the case" and rendered Petitioner's trial fundamentally unfair. Ybarra,

14    656 F.3d at 1001. Rather, Petitioner cherry-picks portions of the evidence generated post-trial,

15    the withheld evidence, and other evidence otherwise not presented to the guilt-phase trial jury to

16    argue they would have cast the trial in a different light without even attempting to grapple with

17    the portions of the same pieces of evidence that undercut his cause.

18    Therefore, the Court finds that the state court's denials of Petitioner's cumulative error

19    claims were not contrary to, or an unreasonable application of, clearly established federal law,

20    nor were they based on an unreasonable determination of fact. The decisions were not "so

21    lacking in justification that there was an error well understood and comprehended in existing law

22    beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly,

23    Petitioner is not entitled to habeas relief on this ground.

### F. Petitioner's Requests for Evidentiary Hearing and Order Directing FBI to Produce Documents and Tapes Under Seal for In Camera Review

26    Petitioner has requested an evidentiary hearing with respect to Petitioner's Brady

27    allegations. (ECF No. 64.) Additionally, Petitioner has requested a court order directing the

Federal Bureau of Investigations ("FBI") to provide this Court, under seal, a complete unredacted copy of its file and all tape recordings of telephone conversations related to the FBI's investigation of Petitioner, Graybill, and Colman. (ECF No. 65.) "If a claim has been adjudicated on the merits in state court, a federal habeas petitioner seeking discovery or an evidentiary hearing must first overcome the relitigation bar of § 2254(d)(1) and (d)(2) based solely on the record that was before the state post-conviction court." Jurado v. Davis, 12 F.4th 1084, 1101–02 (9th Cir. 2021) (citing Pinholster, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.")). Here, as set forth above, Petitioner has not overcome the relitigation bar of § 2254(d)(1) and (d)(2). Accordingly, Petitioner is not entitled to an evidentiary hearing or expansion of the record and his requests should be denied. See Rogovich v. Ryan, 694 F.3d 1094, 1097 (9th Cir. 2012) ("Rogovich contends that the district court improperly denied evidentiary hearings and expansion of the record on the three claims that we have certified for appeal. As the state courts adjudicated each of those three claims on the merits, the district court properly denied the request."); Runningeagle v. Ryan, 686 F.3d 758, 773 (9th Cir. 2012) (finding petitioner "is not entitled to an evidentiary hearing or additional discovery in federal court because his claim is governed by 28 U.S.C. § 2254(d)(1)").

## IV.

## RECOMMENDATION

Based on the foregoing, the undersigned HEREBY RECOMMENDS that:

1. The petition for writ of habeas corpus (ECF No. 1) be DENIED;

2. Petitioner's request for evidentiary (ECF No. 64) be DENIED; and

3. Petitioner's petition for order directing FBI to produce documents and tapes (ECF No. 65) be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   __**February 2, 2023**__

UNITED STATES MAGISTRATE JUDGE